So, with that, we will begin our oral arguments. We'll start with Appeal No. 25-1891, the United States v. Daniel Eta. Mr. Duffy, nice to see you. Good morning, Your Honors, and may it please the Court, Brendan Duffy, on behalf of Appellant Daniel Eta. I'd like to reserve three minutes for rebuttal. Your Honors, the government's position in this case is that every American who crosses the border must turn over their phone so that agents can rummage through the most intimate details of their lives without any individualized suspicion or judicial oversight. This case shows exactly where that leads. FBI agents spent two years investigating Mr. Eta for wire fraud, yet never sought a warrant. When he happened to travel abroad, they realized they could use the border as a constitutional shortcut, so they arranged a pre-planned search to do what the Fourth Amendment would otherwise forbid. They concede they were not looking for contraband, enforcing customs laws, or determining admissibility. They were trying to revolve a stalled investigation. The District Court denied suppression largely based on this Court's decision in Mendez. That was wrong for three reasons. First, this case falls outside the scope of the border search exception because, unlike Mendez, which involved a search for contraband, child pornography, the search here served none of its recognized purposes. Second, even under Mendez's own framework, this was not a routine border search. It was non-routine in every respect. Pre-planned, prolonged, invasive, and conducted to gather evidence. So, at a minimum, it required reasonable suspicion, which the government lacked. And third, finally, to the extent you think the search does fall within Mendez, this Court should reconsider Mendez, given both the history and Riley. The border search exception has been limited... With reasonable suspicion, are you saying there needs to be reasonable suspicion that the agents would have found evidence of a crime, or reasonable suspicion that they would have uncovered contraband? So, our argument, assuming it's a non-routine search, is that the reasonable suspicion of what question has to be tied to the purposes underlying the border search exception. So, the purposes are searching for contraband, customs, and admissibility. So, it has to be one of those things, or else it becomes completely untethered from the purposes underlying the exception. The Supreme Court has said that many times. And so, it has to serve one of those purposes, and the government has conceded that it was not a search for any of those. That's Supplemental Appendix, page 299. The government has conceded that they were not searching for any of those three purposes. And if it's anything like the government says... One of the purposes of the border exception is to keep our borders safe. Why wouldn't investigating transnational crimes fall directly within that? So, two points, Your Honor. I don't think there's been any case that has said safety as a broad measure is one of the purposes. I think one of the purposes are not allowing bad things in. That is the piece that would go to safety. So, that's contraband. Customs and admissibility. This is the Customs Act of 1789. This is the Supreme Court's decision in void. And this is every single Supreme Court decision to address the border search exception. Every single one has addressed contraband. There has not been one single Supreme Court decision that has gone to wrong. They have addressed contraband, but they have their broad language about the border search exception that the reason it exists and the purpose of it is, in part, to keep our borders safe. So, I think that broad... From people and contraband. So, Your Honor, I agree there is some broad language in those cases, and you can pull out quotes, and the government has done that, citing things like plenary authority. But I think if you read closely, all of those cases, I can read one line from Montoya D. Hernandez in particular. So, it says, there is, quote, plenary authority to conduct routine searches and seizures at the border without probable cause or a warrant in order to regulate the collection of duties and to prevent the introduction of contraband into the country. So, one, there is plenary authority, but only when there's a routine search. So, this is not a routine search. And two, that purpose still has to track those underlying purposes of the border search exception, again, or else it engulfs the rule. So, I think things like protecting our borders and territoriality and the plenary authority, we don't disagree with any of those statements, but it still has to track the underlying purposes, and those still have to come within routine searches. So, if this is, if we find this is a routine search, is it your argument that it still has to comply with the purpose? Yes, Your Honor. So, I think the first question- So, for a routine search, if it has to comply with the purpose, you're suggesting that border agents have to know something about the individual or the individual's electronic device before they can look at it. And the case law doesn't support that. Your Honor, I think this is what we do in all the Fourth Amendment contexts, like search incident to arrest, we ask whether the purpose of the search, we look to the objective evidence. Was the purpose of that search for evidence destruction or for safety? And if the answer is no, then it falls outside of the exception, you have to get a warrant. The Fourth Amendment search incident to arrest is more limited than the border search, and the Supreme Court has said this is a broad exception. So, by your argument, if, and the case law has said, a routine search, no reasonable suspicion, no individual suspicion, but if you are overlaying this purpose on it, you are almost overlaying some type of suspicion of the individual or the device. Your Honor, I think you're right in the sense that it sort of like bleeds in the reasonable suspicion of what question and the scope question, and the scope question is what both the Fourth and Ninth Circuits have done. They've asked, what is the purpose underlying the search? Tracking some of those other Fourth Amendment contexts. I do think the reasonable suspicion of what question a lot of times is gonna mirror. So, you can imagine a scenario where the government says, we're gonna search every single cell phone that crosses the border, and it's gonna be for contraband. So, the purpose of that search, there would be evidence that the reason for that search is for contraband, but you would still, because our position is that it's a non-routine search, you would still. But then you're bringing in the subjective intent. Not subjective. Early on, of what the officers are looking for, and in the Fourth Amendment, that's a very objective test. So, not, I don't think we're trying to get into an officer's minds. We're just asking what the objective evidence shows. And I think, again, in this case, I don't think we have to answer that question, because it wasn't a search for contraband, and they've conceded that. Again, supplemental appendix, page 299. But I think additionally, even if we're outside the scope argument that the Fourth and Ninth Circuit have done, I still think you get to the same result when you ask for reasonable suspicion of what. There still has to be reasonable suspicion that tracks the underlying purposes of the exception. Then you're tacking on a reasonable suspicion requirement to a routine search, which again, is contrary to what you said. So, Your Honor, so, sorry, I should have clarified. I do agree that if you find this is a routine search, and I'm happy to talk about why this is different than Mendez, but I think if you do find this a routine search, it would not be, there would not be reasonable suspicion required. But on the, yes. Because I thought you were arguing, my question was, if we find that this is a routine search, do you lose? No, Your Honor. So, I think. And then I think you're going to the purpose, which again, we're circulating. Yeah, so our position still would be, again, tracking some of those other Fourth Amendment contexts that you would, and this is what the Fourth and Ninth Circuit have done, is you would have to look at the objective evidence. It's not getting inside the minds of the officers. You say, what is the purpose of this search? Looking at the objective evidence. So, there's no objective evidence suggesting, I mean, in most cases, there will be objective evidence they're looking for contraband or customs or 99.9% of cases or admissibility. So, I don't think that will be that hard. So, counsel, if the government, if at the border, there is a concern that there's evidence on the phone, identification of a co-conspirator, but that's not tied to contraband, are you saying that the border exception wouldn't apply and you just need to go get a warrant and if the phone gets wiped, the phone gets wiped? That's exactly right, Your Honor. I mean, there's simply no historical evidence. We pointed out in our opening brief that the first case we have found that this sort of cross-border or just evidence of criminality purpose of the border search exception, the first time that's ever been held in a case, I think, was a 2018 case called Caloos. Of course, there's some broad language about the purposes of protecting territoriality, but the actual holding related to just evidence of criminality, there's no historical analog to this. And again, this is the government's burden. If they can't point to an exception to the warrant requirement, historical evidence or precedent, then they lose. It's not our burden. If you had to distill the rule or test or framework that you want us to adopt into a couple or a few sentences, what would it be? So notwithstanding our sort of the categorical approach, just talking about the scope question, so I think you would ask whether the purpose of the search is tethered to one of the exceptions first. So that is admissibility, or excuse me, to one of the purposes underlying the exception. That is admissibility, contraband, or customs. If the answer is yes, then you say, was this a routine or non-routine search? And was there reasonable suspicion related to one of those purposes? Okay, can we talk outside this fact pattern a little bit?  About national security-based searches at the border. So suppose there was a situation where everyone would agree, we're not in an exigent circumstances world, but the United States, based upon law enforcement and intelligence activity, has, or intelligence collection, has a real interest in examining the contents of somebody's phone. Perhaps believing that they're here to take photographs of structure that they want to blow up, or what have you. They want to do it quickly and quietly, and let the person move through the airport so as to continue an investigation. How do we handle that under the framework you just articulated? So let me first say that I don't mean to fight the hypo, but I think most of those cases will fall into exigent circumstances. I'm not at all sure about that. And so assuming we're outside of that. I'm not sure about that at all. So outside of that, I don't think that is one of the purposes underlying the border search exception. I think it is just like if that person was in Chicago, and you had the same exact evidence, you go get a warrant. Now, I don't think the government has pointed to anything showing clearly national security falls in this. I think there is some loose language in appellate cases. Again, I'm... Isn't it hard to believe that the United States doesn't have an interest in protecting the security of the nation itself at the border? I think that's right, but again, we have to understand the Fourth Amendment. That's what troubles me about the categories. So whether or not there's a national security category, again, I'm not gonna quibble too much because it's both not this case, and I think it's a much harder question. And I don't think this court has to answer that here. I think there very well may be in a case where they have to dig up this historical evidence. Maybe there's a better historical argument on national security interests. We just haven't seen it yet in this case, and maybe it would fall within there. But I think my response is, one, if there's no historical evidence supporting it, and we have to understand the Fourth Amendment within that context, it would fall outside. There might be a better argument in the future. And two, most of these cases will fall within exigent circumstances.  Your Honor, I'm happy to talk about, if the court is concerned, either inevitable discovery or good faith. I think both of those. Before we let you sit down, can I rewind you to the very beginning? Yes, please, Your Honor. And I wanna ask you a question about, why in your view was there no reasonable suspicion here? Your Honor, because there has to be reasonable sp... It seems to me that the government had quite a lot. A reasonable suspicion, it still has to be tied to admissibility, customs, or contraband. Again, or else it would swallow the Fourth Amendment exception entirely. It can't simply be general criminality. So, and the government has conceded, again, this is page, supplemental appendix, page 299, they were not searching for any of those purposes. So, whether or not there was reasonable suspicion of criminality generally, I think that is a harder question. Circle back to the categories and the purpose, the objective. Yeah, well, because, Your Honor, otherwise, if it was just evidence of criminality, it would swallow the Fourth Amendment exception whole. So, I think it has to be limited in that way. I see my time has expired. I'm happy to sit down and save for rebuttal if there are no other questions. Let me just follow up on that. I think you do agree that the government had reasonable suspicion to believe that Etta was engaged in criminal activity in the United States. That is, we probably would try to push back, but I think that is certainly a harder, we don't think it's a probable cause, but I think it would be harder to argue on the reasonable suspicion argument. Okay, very well. Thank you, Your Honor. You're welcome. Mr. Peabody. Good morning. May it please the Court, Tom Peabody for the United States. A warrant is not required for routine searches at the border, regardless of whether the subject was stopped to check what he had, who he was, or whether he was conducting a cross-border crime. The defendant in this case invites this Court to join only the Ninth Circuit in adopting a contraband-only rule, but it should not. There is no such limitation in the case law, in history, or in practical reality. Mendez, for one, forecloses that theory. Sure, that case, like most cases, like most cases concerning cell phones, involve contraband. That is not surprising. Child pornography and drug offenses are the cases likeliest to result in criminal prosecutions, as opposed to expulsions or immigration proceedings, an arrest, a lengthy sentence, and an appeal. There is little to be inferred from that. Mendez's holding and reasoning was not specific to contraband. It adopted the categorical rule that Ramsey put forth, born of the doctrine's animating purposes, that the Congress and the executive are charged with checking who and what come into the country and stopping crime from doing so. Mendez, for example, expressly agreed with the First Circuit's decision in Al-Assad, the only appellate case that tests the full scope of customs border policy. Again, we defer to Congress and the executive in making these decisions. What's your response to, these are my words, not Mr. Duffy's words, but what they're basically arguing is there's a complete ruse that went on here at the border. The border is invoked for the source of authority, but this really has nothing at all to do with anything at the border, and it has everything to do with continuing a very traditional criminal law investigation. What's your response to how, if at all, the doctrine should respond to that concern? That multiple federal authorities have overlapping powers is not surprising. They do, in fact, make that argument, Judge, but they can't go so far as to say that customs does not have the authority to investigate cross-border crimes. There is no pushback that I've sensed on the collective action doctrine. There was certainly reasonable suspicion in this case, as the Court alluded to earlier. There were two sources at that point. Yes, that's how this one played out, Judge, but that doesn't mean customs doesn't have an interest or the authority to check on the thing that FBI also charged with investigating transnational crime, national security, and a host of other subjects was investigating at the time. So is that to say that, in a circumstance like this, the customs officers on their own didn't come to the decision that we should pull them into the secondary inspection area and check his phone? It all happened at the impetus of the FBI and the U.S. Postal Inspector, right? Agree with the latter point, not the former. Customs makes its own determination regarding whether it has the authority under its policies that, as the First Circuit has said, are perfectly consistent with the border exception doctrine. That, in this case, it was prompted by the FBI, respectfully, I suggest to the Court, that's a good thing. We want law enforcement agencies working together to stop transnational crime, terrorism, and espionage. I don't make much of it. I understand the rhetorical appeal that it brings to the defense, but as a matter of law and practicality, I think there's a little more to be said. What if they were focused on just a national crime, something that wasn't transnational, as this one? So, say there was a bank robbery in Chicago, and the suspect who they think was involved, the FBI thinks, well, that may have been the person. Look at his phone. Does that matter? It would be a closer call, Judge. It would be different, right? I don't know of any Circuit Court to go so far as to say that domestic-only crimes can be investigated. There is language in the border policy, which, again, the First Circuit has approved of, that arguably could be read. I mean, it mentions financial crimes only, but here we have an international, millions and millions of dollars, fraud scheme, just like the one the Fourth Circuit said in Goncou, is the sort of transnational crime that falls squarely within the border to action exception. What's the government's viewpoint on what the limits are on a routine manual search of a cell phone? Mr. Duffy suggested, under your view, the Border Patrol agents could manually search the phone of everybody coming into the country. Are there limits? Judge, I'm hesitating. Just, I want to understand. Is the limits on what isn't a routine or not non-routine search, or are there? If it is a routine search, what are the limits on what Border Patrol agents can review? Judge, contraband, admissibility, and cross-border crimes. Those are the subject matters that can, there may be others for a different case, but those are the heartland of what the border to action exception is aimed at, and this falls squarely within, arguably, all three, but certainly the third. So how do you analyze the national security hypothetical along the lines that I was articulating? Yeah, Judge, there's been much made about the snowball effect of the government's position. I share the concerns that you expressed during the defense opening. The defendant's theory that the search must only be for contraband would preclude Customs from searching a permanent resident and terrorist telegram account when he crosses the border, even if it had reasonable suspicion to do so. It would preclude Customs from searching a visa-holding suspected spy's WhatsApp or their laptop, again, even if it had reasonable suspicion to believe he was a foreign asset. That's the consequence of their contraband-only rule, and it can't be squared with the history or practical reality as to how the border operates. There was some back and forth about the authority. I would point the court to Title VI and Title VIII. That is what sets forth Homeland Security's authority in this matter. It is to protect national security and to govern admissibility of folks, including at our border. Counsel, if I can turn back to the routine. Are we concerned at all with the length of time the government keeps the phone? Weeks? Destroy a phone? Is any search of a phone at the border routine? Where would you limit that? So I think the President's made clear that manual searches are routine. I think if it's weeks, presumably the phone's owner will have left the airport, otherwise they will have been in custody. And now we're talking about whether there was probable cause or other authority for the seizure of that phone. I willingly admit that at some point the taking of a phone could convert itself to seizure, maybe not only based on time, but based on other circumstances as well. Here we are talking about what the record says is several hours, but unlike Mendez, we're talking about three phones, and we're talking about an attempted extraction. And Mendez also involved in extraction, but the thing that Mendez declared routine was the, I believe it was about a half hour, manual searching. And I think the President's made clear that any manual search of a phone is a routine search. The record didn't seem crystal clear to me. And if you have a site for when the manual search stopped within those hours and when it became necessary to hold the phone longer and go beyond scrolling through. Judge, I do not have a site for that. I don't believe the record makes clear sort of phone by phone when each one was plugged in for the attempted extraction. That evidence is not in the record. Again, what the record says is that it was several hours for three phones, and that includes an attempted extraction. And I think it's a reasonable inference that they didn't just plug it in for 10 minutes and then give up on the thing. So I think you can assume it was a meaningful portion of those several hours. But the equally important two-time, I mean, recall, of course, that Montoya's about a 16-hour delay waiting for, won't be too graphic. But we're nowhere near there here. And so it is both the temporal aspect, Judge Kohler, as you're alluding to, but for us, given that we're limited to several hours, multiple cell phones, given Mendez was 30 minutes in one, and equally importantly, that it is all manual. There is no data dump here. We're not analyzing metadata or IP logs or the like. And so, in our view, it's pretty clearly routine under Mendez and a host of other cases. Is there some durational limit to routine, or is it the government's position that if it's manual, it's routine, period? It doesn't matter if it's seven hours or 17 hours? I think the limit, I would say, Judge, is at some point it could be converted into a seizure. Right, so he walks away. They say, no, I'm not giving you the phone back. They say, sorry, you're gonna have to come back tomorrow. That would convert it to a seizure, which is a different legal analysis. So how would you, outside of the Mendez contraband context, how would you articulate the rule you want us to adopt here? That for routine searches, no reasonable suspicion, let alone a warrant, is required when Customs is exercising its authority to investigate the introduction of contraband, the admissibility of a person, or cross-border crime. Okay, the or cross-border crime is important here, right? Because if you go back to the, in response to Judge St. Eve's question about the bank robbery, you responded by saying it's a closer case. That was, so, if the search at the border was to investigate federal income tax evasion, and a person's returning from Europe, and the Justice Department believes that the trip to Europe was probably to move assets around, but the crime under investigation is federal income tax evasion, then what? So we go a little bit further in the brief, so excuse me, springing authority that's not in there on you, Judge. Section 12 of the Immigration and Nationality Act does dictate that moral turpitude could be a reason for turning someone away at the border. So I don't want to foreclose that possibility on behalf of the government. But it is certainly the case that cross-border crime, and again, we're talking millions of dollars, U.S. victims leaving the country, going to at least Nigeria and other countries as well, is sort of in the heartland of the cross-border crime that Customs has the authority to try to prevent. And if there are no further questions from the Court, we would ask that you affirm. Thank you. Okay, thank you, Mr. Pedotti. Mr. Duffy, you've got some time left. Let me just, Your Honor, let me just start where my colleague left off on the cross-border crime theory. I do think that a lot of this case could end up there. So two responses on that, just to emphasize. The first time this cross-border crime theory has showed up in any federal case that I have seen, and the government hasn't disputed this, is a 2018 case called Caloos, a Fourth Circuit case. The second, and I think Your Honor's question gets exactly to this point, is there's really no limiting principle for this cross-border crime theory, and I think that's a reason just on its own makes it difficult, which is, you can imagine a domestic investigation, and just because the person crosses the border, that automatically puts it into cross-border crime or international nexus. It becomes a Trojan horse to allow an investigation of any criminal crime. And so I don't think there's any history supported, and I think there's no limiting principle as well. The second point- But do you agree that this would fall within a cross-border crime, where you have the defendant in Nigeria placing communications to the United States victims to try to defraud them of money? So, Your Honor, I would lean back on my first argument. I don't think that falls within the purpose, but to the- I understand. And I still would, I think it's a harder case on the facts there. I think it's all happening, you know, the vast majority of the evidence is happening in Chicago, but I think it's a harder case for us to say it's clearly outside the transnational crime, but I think we would still say it's largely domestic. Talking about routine, non-routine, and I just want to make clear, we didn't talk about routine as much. So I think this is plainly a non-routine search, just based on a syllogism of this court's case law and Supreme Court's case law. In Johnson, this court said a non-routine search is one that involves significant privacy interest. The Supreme Court in Riley said a search of a cell phone involves more significant privacy interest than almost any search that can possibly happen outside the cell phone, outside of the home. I think, just given that syllogism, a search of a cell phone has to be non-routine, and I think- But how would you articulate the test you want for routine versus non-routine? It would be understandable to law enforcement agents. You've given a multi-factor test that an agent before searching would have to almost have a diagram, this way, that way, and the Supreme Court has said that Fourth Amendment rules need to be clear for law enforcement so they know where the lines are. Your Honor, and I think that's why our categorical position would be to say a warrant is required in every cell phone case, but I think Mendez is best read as an exception to what should be a presumption based on those cases I was talking about. Mendez said, specifically, it did not get into nooks and crannies of the phone. This is the exact opposite of this, where the agent said there was a voluminous amount of information, so, and it only went to one app. That app was a photos app. Again, heartland of the border search exception. So I think there's many distinctions that it's easy to read Mendez as an exception to, excuse me, I see my time is running out. I think it's easy to read Mendez outside of the scope of that, because, again, it was limited in time, it was limited duration, it was a sort of more natural search. I think for all those reasons, it's easy to read that as an exception to what I think should be closer to a presumption that a cell phone search is a non-routine search. Okay, very well. Thank you, Mr. Duffy. I have a note here that you and your law firm accepted this appeal on appointment, is that correct? We very much appreciate you doing so. Mr. Adish, you know he was very well represented. Mr. Peabody, Ms. Morgan, thanks to the government as well. We'll take the appeal under advisement.